AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

**FILED**

for the

**JUL 27 2018**

Southern District of California

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
|  | ) Case No. |
| Apple iPhone: Model A1661 | ) |
| FCC ID: BCG-E3087A / IMEI: 359177071756244 | ) |

**18MJ4178**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, which is incorporated by reference.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, which is incorporated by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| Title 46, U.S.C., § 70503 | Possession of Marijuana with Intent to Distribute on Board a Vessel |

The application is based on these facts:

See  Affidavit of Agent Jeremy B. Varhola, which is hereby incorporated by reference and made part hereof.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Agent Jeremy B. Varhola, CBP Air and Marine Operations
*Printed name and title*

Sworn to before me and signed in my presence.

Date: **7/27/18**

_____
*Judge's signature*

City and state:  San Diego, California

HON. BERNARD G. SKOMAL, MAGISTRATE JUDGE
*Printed name and title*

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The following property is to be searched:

> Apple iPhone
> Model A1661
> FCC ID No. BCG-E3087A
> IMEI: 359177071756244
> Seizure No. 2018250100000201
> **(Target Device)**



The **Target Device** is currently stored in the Evidence Room at 2750 Womble Road, Suite 103, San Diego, California.

## ATTACHMENT B

## ITEMS TO BE SEIZED

Authorization to search the cellular/mobile telephone described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone for evidence described below.  The seizure and search of the cellular/mobile telephone shall follow the search methodology described in the attached affidavit submitted in support of the warrant.

The evidence to be seized from the cellular/mobile telephone will be records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data for the period of July 4, 2017 through October 4, 2017:

a. Tending to indicate efforts to possess with the intent to distribute marijuana or some other federally controlled substances within the United States;

b. Tending to identify accounts, facilities, storage devices, and/or services – including, but not limited to, remote applications and IP addresses used to facilitate the possession with the intent to distribute marijuana or some other federally controlled substances within the United States;

c. Tending to identify co-conspirators, criminal associates, or others involved in possession with the intent to distribute marijuana or some other federally controlled substances within the United States;

d. Tending to identify travel to or presence at locations involved in possession with the intent to distribute marijuana or some other federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above

which are evidence of violations of Title 46, United States Code, Section 70503.  The search of the **Target Device** will be conducted in accordance with the procedures for electronically stored information protocol in the supporting Affidavit.

**AFFIDAVIT**

I, Jeremy B Varhola, being duly sworn, hereby state as follows:

**INTRODUCTION**

1.     This affidavit supports an application for a warrant to search the following:

   a.     Apple iPhone
          Model A1661
          FCC ID No. BCG-E3087A
          IMEI: 359177071756244
          Seizure No. 2018250100000201
          **(Target Device)**

as described in Attachment A, and seized evidence of crimes, specifically, violations of Title 46, United States Code, Section(s) 70503 – Possession of Marijuana with Intent to Distribute on Board a Vessel, and Title 21, United States Code, Section 841(a) – Possession of Marijuana with Intent to Distribute.  This search supports an investigation and prosecution of Ivan VILLAMIL-Perez for the crimes mentioned above.  A factual explanation supporting probable cause follows.

2.     October 4, 2017, Air and Marine agents for Air and Marine Operations, a component of United States Customs and Border Protection within the Department of Homeland Security, seized the **Target Device** pursuant to an arrest of VILLAMIL-Perez.  VILLAMIL-Perez was on board a vessel approximately one nautical mile west of Point Loma, CA.  Agents believed the vessel had traveled from Mexico into the United States with approximately 365 kilograms (804.68 pounds) of marijuana concealed under the floor of the vessel.  The **Target Device** was found on VILLAMIL-Perez's person.  The **Target Device** is currently stored in the Evidence Room at 2750 Womble Road, Suite 103, San Diego, California.

3.     Based on the information below, there is probable cause to believe that a search of the **Target Device** will produce evidence of the aforementioned crimes, as described in Attachment B.

4.     The information contained in this affidavit is based upon my experience and training, and consultation with other federal, state, and local law enforcement agents. The evidence and information contained herein was developed from interviews and my review of documents and evidence related to this case. Because this affidavit is made for the limited purpose of obtaining a search warrant for the **Target Device**, it does not contain all of the information known by me or other federal agents regarding this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5.     I am an Air and Marine Agent (AMA) for Air and Marine Operations (AMO) which is a component of United States Customs and Border Protection (CBP) within the Department of Homeland Security (DHS). I have been employed as a Federal Agent with AMO since March 2013. I have conducted criminal investigations for violations of federal and state laws for narcotics and human smuggling. Prior to becoming a Federal Agent with AMO, I was employed as a United States Customs and Border Protection Officer. I have been a Law Enforcement Officer with CBP since September 2008. I am classified, trained, and employed as a Federal Law Enforcement Officer with statutory arrest authority charged with conducting criminal investigations of alleged violations of federal criminal statutes. I received an Associate's degree in Criminal Justice from Grossmont College in 2012.

6.     Through the course of my training, investigations, and conversations with other law enforcement personnel, I am aware that it is a common practice for narcotics smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators in order to further their criminal activities. Typically, individuals who smuggle narcotics across the border from Mexico into the United States are in telephonic contact with co-conspirators prior to and following the crossing of the narcotics, at which time they receive instructions of where and when to deliver the controlled substances. Narcotics smugglers and their

2

organizations use cellular telephones, in part, because these individuals believe law enforcement is unable to track the originating and destination phone numbers of calls placed to and from cellular telephones.

7.    Based upon my training and experience as a Federal Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I submit the following:

a.    Drug smugglers will use cellular/mobile telephones because they are mobile and they have instant access to telephone calls, text, web, and voice messages.

b.    Drug smugglers will use cellular/mobile telephones because they are able to actively monitor the progress of their illegal cargo while the conveyance is in transit.

c.    Drug smugglers and their accomplices will use cellular/mobile telephones because they can easily arrange and/or determine what time their illegal cargo will arrive at predetermined locations.

d.    Drug smugglers will use cellular/mobile telephones to direct drivers to synchronize an exact drop off and/or pick up time of their illegal cargo.

e.    Drug smugglers will use cellular/mobile telephones to notify or warn their accomplices of law enforcement activity to include the presence and posture of marked and unmarked units, as well as the operational status of checkpoints and border crossings.

f.    Drug smugglers and their co-conspirators often use cellular/mobile telephones to communicate with load drivers who transport their narcotics and/or drug proceeds.

g.    The use of cellular/mobile telephones by drug smugglers tends to generate evidence that is stored on the cellular/mobile telephones, including, but not limited to emails, text messages, photographs, audio files, call logs, address book entries, IP addresses, social network data, and location data.

8.    Subscriber Identity Module (SIM) Cards, also known as subscriber identity modules, are smart cards that store data for cellular/mobile telephone

3

subscribers. Such data includes user identity, location and phone number, network authorization data, personal security keys, contact lists and stored text messages. Much of the evidence generated by a smuggler's use of a cellular/mobile telephone would likely be stored on any SIM Card that has been utilized in connection with that telephone.

9. Based upon my training and experience as a Federal Agent, and consultations with law enforcement officers experienced in narcotics smuggling investigations, and all the facts and opinions set forth in this affidavit, I have learned that cellular/mobile telephones often contain electronic records, phone logs and contacts, voice and text communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular/mobile telephone. Specifically, I have learned that searches of cellular/mobile telephones associated with narcotics smuggling investigations yield evidence:

a. Tending to indicate efforts to possess with the intent to distribute marijuana or some other federally controlled substances within the United States;

b. Tending to identify accounts, facilities, storage devices, and/or services – including, but not limited to, remote applications and IP addresses used to facilitate the possession with the intent to distribute marijuana or some other federally controlled substances within the United States;

c. Tending to identify co-conspirators, criminal associates, or others involved in possession with the intent to distribute marijuana or some other federally controlled substances within the United States;

d. Tending to identify travel to or presence at locations involved in possession with the intent to distribute marijuana or some other federally controlled substances within the United States, such as stash houses, load houses, or delivery points;

4

e.  tending to identify the user of, or persons with control over or access to, the cellular/mobile telephone; and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

10.   On October 4, 2017, CBP AMAs Taillon, Griffin, Wagley, and Cason were onboard CBP vessel M805 patrolling in the vicinity of San Diego, CA.   At approximately 10:50 a.m., an electronics sensor operator attached to the United States Coast Guard (U.S.C.G.) contacted the crew of M805.   The sensor operator notified them that he was tracking a vessel which had recently crossed the United States and Mexico maritime boundary.   The operator informed the crew that the vessel was northbound just beyond the entrance to San Diego Bay.

11.   CBP Vessel M805 proceeded north from San Diego Bay while the U.S.C.G. sensor operator guided them towards the vessel to a position roughly one mile west of Point Loma, CA.   The crew of M805 approached the tracked vessel and noted that it was stationary in the water with its engine off.   Upon coming alongside this vessel, the crew of M805 observed a single occupant aboard the vessel bearing California Registration Number 7371TT.

12.   AMAs Wagley and Griffin boarded the suspect vessel for the purpose of performing a documents check (authorized by 19 U.S.C. § 1581).   The sole occupant of the vessel later identified as Ivan VILLAMIL-Perez, a citizen of Cuba and a Legal Permanent Resident of the United States, advised Wagley and Griffin that the engine of the vessel had no power, was overheating, and would not run.

13.   Agents asked VILLAMIL-Perez if he was the owner of the vessel and VILLAMIL-Perez stated that he had just bought the vessel the day prior.   VILLAMIL-Perez handed agents the registration paperwork for the vessel as well as his Lawful Permanent Resident Card.   Agents Wagley and Griffin asked VILLAMIL-Perez from where he was coming.   VILLAMIL-Perez then pointed in the direction of San Diego

and stated in Spanish, "Here, San Francisco." Agents told VILLAMIL-Perez that, "they were in San Diego and not San Francisco." VILLAMIL-Perez stated he was not from the area. Agents asked VILLAMIL-Perez where he was from and he said Florida. Agents asked VILLAMIL-Perez what he was doing in San Diego. VILLAMIL-Perez replied that he was in the boat business. Agents asked VILLAMIL-Perez if he had any other identification documents and he produced a Florida driver's license.

14.     Agents observed three gasoline cans tied within the stern of the vessel. Agents also saw an array of screws strewn about the deck of the vessel, and noticed that sealant had been removed from the center console of the vessel. Agents further noticed fresh sealant in various areas of the vessel along with many screws missing from structural panels and hardware around the helm station. The vessel was eventually taken to the U.S. Customs Dock located on Shelter Island, CA, for further inspection.

15.     Once at the Customs Dock, Agent Wagley advised Agent Varhola that when he took control of the helm of the vessel he noticed no overheating issues with the engine, but felt the vessel had difficulty getting on plane. Based on his training and experience, Agent Wagley believed that a vessel with a 250-horsepower motor and a light hull should be able to proceed faster. Agent Wagley pushed the throttle to the wide open position and the vessel still felt sluggish. Further, Agent Wagley stated that the vessel was listing hard to starboard even after attempting to correct the leaning with the engine's trim tabs. This led the agent to believe there was a significant amount of weight below the deck on the vessel.

16.     At approximately 1:30 p.m., agent Charde cut a hole through the fiberglass deck in the bow area and observed several packages wrapped in cellophane below the deck. The vessel was transported to the Otay Mesa Seizure Vault for further inspection. At the Otay Mesa Seizure Vault, Agents Levan, Linscott, Humphrey, and Vaughn dismantled the vessel and located 229 packages containing suspected marijuana and weighing 365 kilograms. AMO Agents probed a random package which yielded a green

1  leafy substance that tested positive for the characteristics of marijuana. Agents arrested
2  VILLAMIL-Perez and seized the **Target Device**.[1]

3      17.    At approximately 3:15 p.m., Agents Nordhausen and Varhola read
4  VILLAMIL-Perez his <u>Miranda</u> rights in the Spanish language. VILLAMIL-Perez
5  elected to speak with agents without an attorney present. VILLAMIL-Perez stated that
6  he had no knowledge of the drugs on board the vessel. VILLAMIL-Perez told the
7  agents that he had departed from Ensenada, Mexico, at 8:00 a.m. that morning.
8  VILLAMIL-Perez stated that he had searched the vessel for drugs prior to leaving
9  Ensenada, and did not find anything.

10      18.    VILLAMIL-Perez claimed that the day before, he met with an unknown
11 individual in Ensenada who gave him the keys to the vessel. VILLAMIL-Perez was
12 unable to recall on which street he received the keys, nor at which Ensenada marina he
13 received the vessel. VILLAMIL-Perez stated "all I was doing was driving the boat, and
14 I was going to deliver the boat to either Long Beach, Dana Point, or Newport."

15      19.    VILLAMIL-Perez said that he would make or receive a phone call two
16 hours into his trip for instructions on where to deliver the vessel. VILLAMIL-Perez
17 stated he placed a call before being intercepted by law enforcement officers.

18      20.    Based upon my experience investigating narcotics traffickers and the
19 particular investigation in this case, I believe that VILLAMIL-Perez used the **Target**
20 **Device** to coordinate the importation of federally controlled substances into the United
21 States. In addition, I believe that recent calls made and received, telephone numbers,
22 contact names, electronic mail (e-mail) addresses, appointment dates, text messages,
23 pictures and other digital information may be stored in the memory of the **Target**
24 **Device** which may identify other persons involved in narcotics trafficking activities.
25 Accordingly, based upon my experience and training, consultation with other law
26 enforcement officers experienced in narcotics trafficking investigations, and all the

27

28 [1] On October 4, 2017, agents examined some of the phone's contents. In an abundance of caution, I ask the
court not to consider information agents may or may not have seen during that examination in determining
whether there is probable cause for the requested warrant.

1  facts and opinions set forth in this affidavit, I believe that information relevant to the
2  narcotics smuggling activities of VILLAMIL-Perez, such as telephone numbers, made
3  and received calls, contact names, electronic mail (e-mail) addresses, appointment
4  dates, messages, pictures, and other digital information are stored in the memory of the
5  **Target Device**.

6       21.    Finally, I have learned that narcotics trafficking activities often entail
7  intricate planning to evade detection by law enforcement.  In my professional training,
8  education, and experience, I have further learned that this requires planning and
9  coordination in the days, weeks, and often months prior to the event.  Therefore, I
10  request permission to search the **Target Device** for items listed in Attachment B
11  beginning on July 4, 2017, up to and including October 4, 2017.  This request includes
12  the three months prior to VILLAMIL-Perez's arrest date.

13                                    **METHODOLOGY**

14       22.    It is not possible to determine, merely by knowing the cellular/mobile
15  telephone's make, model and serial number, the nature and types of services to which
16  the device is subscribed and the nature of the data stored on the device.  Cellular/mobile
17  devices today can be simple cellular telephones and text message devices, can include
18  cameras, can serve as personal digital assistants and have functions such as calendars
19  and full address books and can be mini-computers allowing for electronic mail
20  services, web services and rudimentary word processing.  An increasing number of
21  cellular/mobile service providers now allow for their subscribers to access their device
22  over the internet and remotely destroy all of the data contained on the device.  For that
23  reason, the device may only be powered in a secure environment or, if possible, started
24  in "flight mode" which disables access to the network.  Unlike typical computers, many
25  cellular/mobile telephones do not have hard drives or hard drive equivalents and store
26  information in volatile memory within the device or in memory cards inserted into the
27  device.  Current technology provides some solutions for acquiring some of the data
28  stored in some cellular/mobile telephone models using forensic hardware and software.

1  Even if some of the stored information on the device may be acquired forensically, not
2  all of the data subject to seizure may be so acquired.  For devices that are not subject
3  to forensic data acquisition or that have potentially relevant data stored that is not
4  subject to such acquisition, the examiner must inspect the device manually and record
5  the process and the results using digital photography.  This process is time and labor
6  intensive and may take weeks or longer.

7      23.    Following the issuance of this warrant, I will collect the **Target Device**
8  and subject it to analysis. All forensic analysis of the data contained within the **Target**
9  **Device** and memory card(s) will employ search protocols directed exclusively to the
10 identification and extraction of data within the scope of this warrant.

11     24.    Based on the foregoing, identifying and extracting data subject to seizure
12 pursuant to this warrant may require a range of data analysis techniques, including
13 manual review, and, consequently, may take weeks or months.   The personnel
14 conducting the identification and extraction of data will complete the analysis within
15 ninety (90) days, absent further application to this court.

16                          **CONCLUSION**

17     25.    Based on all of the facts and circumstances described above, probable
18 cause exists to conclude that VILLAMIL-Perez used the **Target Device** to facilitate
19 violations of Title 46, United States Code, Section 70503, and Title 21, United States
20 Code, Section 841.

21     26.    Because the **Target Device** was promptly seized during the investigation
22 of VILLAMIL-Perez's smuggling activities and has been securely stored, probable
23 cause exists to believe that evidence of illegal activities committed by VILLAMIL-
24 Perez continues to exist on the **Target Device**.  As stated above, I believe that the date
25 range for this search is from July 4, 2017 through October 4, 2017.

26 ///
27 ///
28 ///

27. WHEREFORE, I request that the court issue a warrant authorizing law enforcement agents and/or other federal and state law enforcement officers to search the items described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

I swear the foregoing is true and correct to the best of my knowledge and belief.

_____
Agent Jeremy B. Varhola
CBP Air and Marine Agent

Subscribed and sworn to before me this __27__ day of July, 2018.

_____
Honorable Bernard G. Skomal
United States Magistrate Judge

10